# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LAURENCE K. LIBBERTON,
              *Petitioner-Appellant,*

              v.

CHARLES L. RYAN, interim Director
of the Arizona Department of
Corrections,

              *Respondent-Appellee.*

No. 07-99024

D.C. No.
CV-97-01881-EHC

OPINION

Appeal from the United States District Court
for the District of Arizona
Earl H. Carroll, District Judge, Presiding

Argued and Submitted
June 3, 2009—Pasadena, California

Filed October 2, 2009

Before: William A. Fletcher, Richard R. Clifton and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge William A. Fletcher

**COUNSEL**

Jose A. Cardenas, LEWIS & ROCA, Phoenix, Arizona, Denise Irene Young, Tucson, Arizona, for the petitioner-appellant.

Robert J. Gorman, Jr., Kent E. Cattani, OFFICE OF THE ARIZONA ATTORNEY GENERAL, Tucson, Arizona, for the respondent-appellee.

**OPINION**

W. FLETCHER, Circuit Judge:

Laurence Libberton, Steven James, and Martin Norton were convicted in separate proceedings in Arizona state court for crimes connected to the murder of Juan Maya. The prosecution theory at trial was that Libberton, along with James and Norton, severely beat Maya, drove him to an isolated area, killed him, and threw his body down a mine shaft. The prosecution contended that Libberton and James were essentially equal participants in the murder. The prosecution contended that Libberton, who had recently walked away from a work furlough program, participated in the killing because he wanted to use Maya's car to flee the jurisdiction. The jury returned a verdict of guilty for first degree murder, robbery, theft, and kidnapping. The judge sentenced Libberton to death.

James was convicted of first degree murder and sentenced to death in a separate trial. Norton, a minor, pleaded guilty in juvenile court to participating in the murder and was sentenced to three years in prison. In accordance with his plea agreement, Norton testified at Libberton's trial. Norton described Libberton as a central and willing participant in Maya's murder.

The federal district court denied Libberton's petition for a writ of habeas corpus. Libberton appeals five holdings by the district court. Two of those holdings were not certified as appealable issues by the district court, but we certified them before holding oral argument.

One of Libberton's arguments concerns whether his current federal petition for habeas corpus is governed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). Because our holding on this issue affects our holdings on the others, we address it first.

The four remaining issues are as follows. First, Libberton claims that Norton entered into a deal with prosecutors that affected his testimony at trial. Libberton contends that the state failed to disclose this deal, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). Second, Libberton claims that prosecutors failed to correct Norton's false testimony that he had not been given the aforementioned deal, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). Third, Libberton claims that the state courts applied an unconstitutional sentencing factor, in violation of *Tennard v. Dretke*, 542 U.S. 274 (2004). Fourth, Libberton claims that his counsel was unconstitutionally ineffective in connection with his sentencing, in violation of *Strickland v. Washington*, 466 U.S. 668 (1984).

For the reasons that follow, we hold that AEDPA governs Libberton's habeas petition. We affirm the district court's denial of habeas on Libberton's first three claims, as numbered above. We reverse on his fourth claim. The result is that we deny Libberton's petition for a writ of habeas corpus with respect to the guilt phase of his trial, but grant with respect to the sentencing phase.

## I.   Background

## A.   The Investigation

On November 18, 1981, Laurence Libberton, Martin Norton, Steven James, and Daniel McIntosh were taken into custody on suspicion of forgery. Libberton had used identification belonging to Juan Maya while attempting to cash a check at a bank. He was apprehended as he was leaving the bank. The others were apprehended while waiting outside in Maya's car. Libberton was booked into county jail on suspicion of forgery. Norton, James, and McIntosh were released. After Maya's father informed police that his son was missing, police located and interviewed Norton and James.

During his first interview with police investigators, Norton told police Detective Russell Davis different versions of what had happened on the night of November 16, two days earlier. Norton initially said that he had been hitchhiking that evening and had been picked up by Maya. He reported that he had gotten into Maya's car, and Maya had made "sexual advances at him by trying to kiss him and put his hands in his pants." Norton claimed that he responded by punching Maya, getting out of the car, and fleeing. Norton went to Steven James's trailer where he had been living, but Maya followed him in the car. According to this version of his story, Norton was able to evade Maya before reaching the trailer. Norton said that he never saw Maya again.

However, as the interview continued, Norton changed his story. Norton now said that Maya came to James's trailer, and that he saw James and Libberton beat Maya. In this version of his story, Norton claimed that after severely beating Maya, James and Libberton put Maya in the back seat of his own car. James and Libberton then drove away with Maya in the car, telling Norton that they would be back "in a little while" and that he should clean up the trailer while they were gone. When Libberton and James returned hours later, they told Norton "not to tell a soul about this, or [Norton] would die the same way [Maya] did."

Police then interviewed James. James said that Norton came running up to the door of James's trailer on the evening of November 16 and told James that someone, who turned out to be Maya, was "following him and was trying to rape him." James said that he and Norton left the trailer in search of Maya. They saw him "running down the drive further into the park." They chased him, caught him, and brought him back to the trailer. James said that Norton slapped Maya, and tried to get him to reveal "where his money was at." James said that Norton and Libberton then took Maya out to his car and put him inside. At that point in the interview, James requested a lawyer.

Shortly thereafter, James voluntarily offered to show investigators Maya's body. Police drove with James to his parents' property southwest of Salome, Arizona. James directed police to a mine shaft on the property in which they could see Maya's body.

Norton was interviewed again on November 26, this time by Detective Jack Hackworth. Norton had now been charged with forgery and murder. Norton once again stated that he was hitchhiking on the evening of November 16 and that Maya picked him up. Norton said that Maya's car had electric locks and that Maya locked the doors once Norton was inside the car. He said that "he became frightened" after Maya made sexual advances toward him, and that he told Maya that if he went with him to a friend's trailer, Norton "had a friend that was also queer there and they could make out." Norton said that Maya agreed. After reaching the trailer, however, Norton said that he told James and Libberton that Maya was "a queer," and that James and Libberton assaulted him, making him bleed profusely. James took Maya's wallet and threw it to Norton. James pulled out a rusty pistol and pointed it at Maya, and James and Libberton then dragged Maya outside to his car. In this version of his story, Norton said that he got into the car with the others. Norton said that James drove while Libberton sat in the back seat pointing a gun at Maya.

Norton said that during the drive, James stopped at a gas station where he purchased a carton of cigarettes and filled Maya's car with gas. James used Maya's credit card and forged Maya's name on the receipt. James said during the ride that they were going to shoot Maya and throw him down a mine. According to Norton, Maya could hear what Libberton and James were saying. Norton said that he pleaded with the other two men not to kill Maya, but that Libberton responded: "No, if we don't kill him, he will snitch us off."

Norton said that once they reached the mine, James pointed the gun at Maya and walked him up to the opening to the

mine shaft. James then shot Maya in the left forearm and handed the gun to Norton. Norton said that he then passed the gun on to Libberton, who shot Maya in the head. Maya appeared to be breathing, so James shot him again. He still appeared to be alive, so James hit him with a large rock. Libberton did the same. Both James and Libberton then told Norton to hit Maya with a rock. Norton said that he threw a rock toward Maya, but missed. James then said, "You either help kill him or we'll kill you." Norton said that he then hit Maya in the back with a rock.

Norton said that James and Libberton dragged Maya by his belt up to the mine shaft and threw him in. The three men then returned to Maya's car and drove back to Phoenix. Norton said, "It was pretty quiet [in the car]. Nobody said much other than both [Libberton] and [James] told me if I told anyone, I would be in the shaft with him."

After Norton gave this statement, the Juvenile Division of the Maricopa Country Superior Court appointed attorney Robert A. Wertsching to represent him. Norton was fourteen years old at the time of the crime. During Libberton's state post-conviction proceedings in 1994, Libberton submitted an affidavit signed by Wertsching in which Wertsching stated that soon after his appointment he had at least two conversations with the head prosecutor of the juvenile division, during which they discussed whether the County Attorney would agree to try Norton as a minor rather than as an adult. According to Wertsching, the prosecutor indicated orally that "if Mr. Norton would give a full and accurate statement to the County Attorney and would testify consistently with that statement at the trials of the adults who participated in the homicide offense, the County Attorney would not seek to have [Norton] transferred to adult court." Norton subsequently met with Myrna Parker, a Deputy County Attorney, who conducted her own interview of Norton. Parker was later the lead prosecutor in Libberton's criminal trial.

Norton's statement to Parker was more detailed than his previous statements to the police. Although the broad outline of his story remained the same, some of the details were inconsistent with those in the previous statements. Based on Wertsching's affidavit, Libberton contends that Norton made a deal with prosecutors that he would be tried as a juvenile; that he made this deal after providing his statements to police but before providing his statement to Parker; and that this deal was not disclosed to Libberton before his trial. Because Libberton contends that prosecutors violated *Giglio* in failing to disclose the deal, and *Napue* in failing to correct Norton's false testimony that there had been no such deal, it is important to compare the statements Norton gave before and after the alleged deal. We therefore recount his statement to Parker in detail.

Before beginning the substance of the tape-recorded interview, Parker stated that at that time there was no deal between Norton and the prosecutors:

> The end result of this interview with you is that we are going to attempt to set up an agreement between you, your attorney and the county attorney's office regarding the charges that are now pending against you in the death of Juan Maya. None of that has been put down in writing at this time, and in fact we haven't even explored what those possibilities may be. It will all depend upon your truthfulness during this interview today.

Wertsching's statements in his post-trial affidavit regarding the existence of an agreement contradict this statement by Parker.

Norton began the interview by explaining that he had known James for only about a week before Maya was killed, but that he had effectively moved into his trailer. He described James as heavy, with a lot of tattoos, and as "real

mean." James claimed that he had killed a number of people and that he had family in the mafia. James was a heavy drug user. Norton described Libberton as having a "bad attitude," though Norton said he "kind of liked me." Norton knew that James had a .44 magnum handgun that he kept under a chair in his living room. James had acquired the gun from a friend "because his wife had been kidnapped from what I hear and he wanted [it] for protection." Norton was unaware of any weapons owned by Libberton.

Norton said that earlier on the night of the crime, he had been at James's trailer with James, Norton's friend "Ralph," Daniel McIntosh, and Libberton. They smoked pot and drank alcohol. At approximately 10:30 pm, Ralph and Norton left the trailer to get dinner. They intended to "dine and dash," meaning to eat at a restaurant and leave without paying, but the restaurant management called the police before they could leave. The police took Ralph and Norton to their respective homes. Norton said that he stayed home for about ten minutes, where he "got something to drink and smoked a couple of joints." He left after his mother gave him a pack of cigarettes.

Norton said that he then walked towards James's trailer, attempting to hitchhike. He was soon picked up by Maya. Maya drove Norton toward James's trailer, but before arriving he stopped, turned off the motor, and moved closer to Norton. According to Norton, Maya did not say anything to indicate what he was doing, but directed Norton not to interfere. Maya attempted to remove Norton's pants, but Norton pushed him away. According to Norton:

> I couldn't think of a way to get away from him so I told him I said well let's go in the trailer because I have a friend in there who's gay and he'll give you what you want and you don't have to get me, and he said boy I don't know, I don't know you very good.

Norton led Maya into the trailer where they encountered James and Libberton. Norton "quickly went around [James] and [ ] said [James] get him away from me and he looked at me and looked at him and I said he's a queer, get him away from me and [James] kicked him."

Norton said that Maya then attempted to flee. James and Libberton chased him, ultimately catching him and bringing him back to the trailer. James, Libberton, and Norton began to beat Maya. During a pause in the beating, James pulled out his gun, pointed it at Maya, and told Maya to hand over his wallet. James demanded that Maya pull down his pants so James could see if he had anything else hidden on him. Libberton, who had found the title to Maya's car in the wallet, walked over to Maya and demanded that he sign over the title to Libberton. Maya did so.

James then asked what they were going to do with Maya. Libberton suggested letting him go, but James said they could not do that. James asked Norton what he thought, and Norton suggested beating him up some more. James responded that they would have to kill him. Norton said that Libberton

> looked at [James] kind of funny and [James] said [gap in the transcription] and [Libberton] said well I think your [sic] right in a way and then [James] said in a way, in a way what? [Libberton] said in a way that if we're caught we'll be [gap in the transcription] for murder. [James] said there's no way we'll get caught because I know a perfect place to put a body.

Norton said that Libberton and James then began to discuss the plot to murder Maya. The four of them left James's trailer and departed in Maya's car. James drove while Libberton sat in the back seat with the gun pointed at Maya.

Norton said that James stopped at a gas station where he filled the car with gas and bought a carton of cigarettes, both

paid for with Maya's credit card. Norton described the car as "totally quiet all the way" out to the mine. At some point during the trip, the car was stopped for speeding. James quickly got out of the car and walked back to the police officer, who apparently did not give James a ticket. The officer never came close enough to the car to see Maya, and Libberton kept the gun pointed at him in the car. After they began driving again, Maya fell asleep. When they were approximately five miles from the mine, Norton asked James not to kill Maya. James responded that "we went this far, we're going to go all the way."

Norton said that when they arrived at the mine, Libberton opened the door of the car to let Maya out. Norton said, "I shook [Maya's] hand and I said [Maya], I'm sorry this has to happen." James stood at the top of a hill next to the mine and told the others to come up. Libberton walked behind Maya, holding the gun on him. James allowed Maya to finish a cigarette, after which Maya began pleading for his life. James pointed the gun at Maya and pulled the trigger. The gun apparently misfired. Maya then jumped at James, grabbed the gun, and pulled it toward his chest. James tried and failed to recover his weapon, and Libberton attempted to retrieve the gun by hitting Maya with a rock. Maya held onto the gun until Libberton, using a board handed to him by Norton, hit him on the back. James then grabbed the gun and tried to shoot Maya again. It is unclear from Norton's statement if a bullet hit Maya, but Norton reported seeing blood on Maya's right arm. James then handed the gun to Norton, but Norton either did not or could not shoot it. Norton then handed the gun to Libberton. According to Norton, Maya was still breathing at this point, but was "almost dead."

> [Maya] was just going uh uh breathing really hard and rapidly and [Libberton] put the gun about 10 inches from his head and pulled the trigger. He wasn't breathing anymore. A gurgling sound started coming out. [James] didn't know what was going on.

> That son of a bitch ain't dead yet. So he picked up a real heavy rock, it was heavy because he barely put it up and slammed it down on his head. . . . [James] threw the rock on his head, [Libberton] picked up the exact same rock and threw it on his head, and then [James] pointed over to me and said it's your turn to throw the rock on his head.

Norton threw a different rock that hit Maya's head. James then walked over to Maya and determined that he was dead.

Norton said that Libberton and James dragged Maya by his belt loops up to the mine shaft and dropped him in. The three of them then returned to Maya's car. James then said, "Norton, you say one word to anybody, I mean anybody, even Ralph, I'll kill you." Libberton added, "[Y]ea, you'll find your body right next to [Maya]." They then drove back to Phoenix. Norton said that he slept the entire way. After arriving at James's trailer, James and Libberton went to pick up Dan McIntosh and directed Norton to clean up the trailer.

At the end of the interview, Parker asked why Norton had told a different story to police. Norton replied that he had been scared because he knew that he could be charged with murder.

At some point after his interview with Parker, Norton signed an undated plea agreement in which he agreed to testify in any proceeding relating to Maya's murder, and to do so in a manner consistent with the statement he had provided to Parker. In exchange for his testimony, the state agreed not to prosecute Norton as an adult. Norton agreed to "admit in Juvenile Court to the allegations of First Degree Murder, Kidnapping, and Armed Robbery."

## B. Guilt-Phase Trial

Libberton was charged with first degree murder, aggravated robbery, kidnapping, and theft. Trial began on June 23, 1982,

in Maricopa County Superior Court. Libberton was represented by George Lim.

Norton testified on June 28. Parker, acting as lead prosecutor, questioned him. The substance of Norton's testimony was largely consistent with what he had said in his interview with Parker. We recount here only the inconsistencies:

First, Norton testified that Libberton agreed without hesitation with James's suggestion that they had to kill Maya in order to conceal their other crimes. In his interview with Parker, however, Norton had said that Libberton had suggested that they let Maya go, and that James had then convinced him that they should kill Maya. Lim pointed out this discrepancy on cross-examination, and Norton responded that "[i]t was either me or him," and that "I can't remember everything that happened." Later in his testimony, Norton stated that both he and Libberton had suggested releasing Maya.

Second, Norton testified that while James was speaking with the police officer who stopped the car on the way to the mine, Libberton told Maya that if he said anything Libberton would shoot him. Norton had not mentioned this in his interview with Parker.

Third, Norton testified that once they arrived at the mine Libberton walked up to the mine shaft first, Maya went up behind him, and James followed Maya with the gun. In his interview with Parker, Norton had said that James had led the way up the hill, and that Libberton had followed Maya with the gun. Lim pointed out this discrepancy on cross-examination. Norton responded that his earlier statement to Parker "might have been mistaken."

Finally, Norton never testified that he had held James's gun. In his interview with Parker, he had stated he had held the gun, but that he either did not or could not shoot it.

Parker was at pains to emphasize during her examination that Norton's earlier statements had not been given in consideration for a deal of any kind. Parker asked: "When you were interviewed at Durango by Detective Hackworth, did he promise you anything?" Norton responded: "No." "[D]id you know whether or not you would be treated as a juvenile or an adult in the prosecution?" Norton responded: "No." "Did you indicate that you would testify against Laurence Libberton and Steven James?" Norton responded: "No." Parker next asked whether Norton had been offered any deal when she had interviewed him. Norton responded: "No." Parker then established that Norton had entered into a plea agreement after his interview with her, whereby he agreed to testify truthfully against Libberton and James, and that Norton had then pled guilty and was sentenced in juvenile court.

Parker delivered her closing statement on June 30. She emphasized that, other than the plea agreement, Norton had never been offered anything in exchange for telling a particular story. Specifically, she told the jury that "at no time when [Norton] talked to Detective Hackworth, initially, or at no time when he talked to me, did he have anything, nothing, except a conscience, probably at that point. That's why he got up there and told what happened." Elsewhere, Parker noted that Norton "received no deal other than he would testify down in Juvenile Court. And when he first talked about testifying, he had received nothing."

The jury deliberated for less than a day and returned a verdict of guilty on all charges.

### C.   Penalty-Phase Trial

A sentencing hearing was held on October 20, 1982. At that time, Arizona law provided that the judge rather than the jury decide whether to impose the death penalty. This procedure was later declared unconstitutional in *Ring v. Arizona*, 536

U.S. 584 (2002). However, *Ring* is not applied retroactively. *Schriro v. Summerlin*, 542 U.S. 348 (2004).

The prosecution called two witnesses to testify at the sentencing hearing. The defense also called only two witnesses. (As we discuss below, an effective defense counsel would have discovered and presented extensive additional evidence.) The judge also had before him two psychological reports that were prepared in advance of the hearing, as well as a presentence report ("PSR") prepared by the Arizona state probation office. The judge sentenced Libberton to death on October 25, 1982.

## D.   Direct Appeal

Libberton appealed his conviction and sentence to the Arizona Supreme Court. That Court addressed six issues: (1) whether the verdict forms were improper; (2) whether the sentencing judge's failure to find beyond a reasonable doubt that Libberton killed Maya was reversible error; (3) whether permitting a judge to find aggravating and mitigating circumstances was unconstitutional; (4) whether it was unconstitutional for the Arizona statute not to provide guidelines on balancing aggravating and mitigating circumstances in capital cases; (5) whether it was fundamental error to admit evidence of Libberton's absence from work furlough; and (6) whether one of the aggravating factors was properly applied to Libberton. *See Arizona v. Libberton*, 685 P.2d 1284, 1286-87 (Ariz. 1984). The state Supreme Court affirmed on each issue.

## E.   State Court Post-Conviction Proceedings

Libberton filed a number of state post-conviction petitions ("PCR Petitions"). His first was filed on July 27, 1984. It claimed ineffective assistance of trial counsel ("IAC") "at every critical stage of the proceeding." This petition was summarily denied on October 16, 1984. Libberton filed a second

PCR Petition on April 26, 1985, in which he claimed IAC by his appellate counsel. This petition was summarily denied on March 13, 1986. In both petitions, Libberton requested an opportunity to present evidence relating to his claims. Both requests were denied.

In December 1986, Libberton sought habeas corpus in federal district court, asserting thirty-nine claims. *Inter alia*, the petition claimed that Libberton's trial counsel had been unconstitutionally ineffective during both the guilt and penalty phases. Libberton asked the district court for leave to conduct discovery. *Inter alia*, he asked for permission to depose McIntosh, who had been with Libberton at the time of his arrest but had not participated in Maya's murder. Libberton noted that McIntosh's deposition was necessary in order to preserve his testimony because he planned to leave the state within a few weeks. Libberton later withdrew this request because McIntosh decided not to leave the state. Proceedings relating to Libberton's federal petition were stayed on June 30, 1987 to permit Libberton to exhaust some of his claims in state court.

Libberton filed a third PCR Petition in state court on September 14, 1987, asserting forty-eight claims. Some of those claims had been raised in previous PCR Petitions, but were raised again to "avoid any argument by the state that petitioner is procedurally barred from raising them in later federal habeas corpus proceedings for failing to raise them now." The PCR petition further noted that "there is newly discovered evidence relating to petitioner's claims of ineffective assistance of trial and appellate counsel." The petition claimed that Libberton was denied effective assistance of counsel at both trial and sentencing. Libberton again requested funds to pursue discovery, as well as an evidentiary hearing.

On February 10, 1988, the state court denied Libberton's third PCR Petition. The judge who ruled on the petition was the same judge who had presided over Libberton's trial and

had imposed the death sentence. The court wrote, "Having presided at the trial of this case, this court is of the opinion that nothing defendant has raised in his current petition for post-conviction relief would have affected the outcome of the trial or the sentencing." The court wrote, "[T]he defendant received nothing but effective assistance of three very experienced and qualified criminal attorneys." The court denied funds to pursue discovery and denied an evidentiary hearing.

Libberton returned to federal district court, filing a second amended habeas petition on September 30, 1991. On April 8, 1992, Libberton asked the court for leave to conduct discovery. Specifically, he asked for and was granted permission to depose Lim, McIntosh, and a third man, Harry Dean. Soon thereafter, lawyers working on James's federal habeas petition asserted for the first time that Norton had received an undisclosed deal from prosecutors. James and Libberton had been aware, at the time of their trials, of the conditions of Norton's plea agreement. But James's attorneys now asserted that Norton had received an earlier, undisclosed deal, before his interview with Parker, wherein he agreed to provide a statement and then to testify in a manner consistent with that statement in return for an agreement that he would not be tried as an adult. James's attorneys supported their assertion with an affidavit signed by Norton's attorney, Robert Wertsching.

The district court dealing with James's federal habeas petition concluded that

> for purposes of challenging a witnesses' credibility, there may be a significant difference between a statement given in reliance upon a negotiated deal, and an unsolicited statement which is given and then, to ensure the witnesses' testimony at trial, a plea agreement is negotiated. One provides incentive for a witness to testify, while the other may provide motivation for the statement itself.

In light of the Wertsching affidavit, the district judge dealing with Libberton's federal habeas petition agreed to let him return to state court to exhaust any claims relating to the affidavit.

The parties in Libberton's case stipulated to dismiss his federal habeas petition without prejudice in order to allow him to exhaust any Wertsching-related claims. The written stipulation provided that "Libberton's Third Amended Petition for Writ of Habeas Corpus may be dismissed without prejudice." The stipulation went on to provide, "Petitioner shall, if necessary, file an amended federal petition for writ of habeas corpus within 30 days after conclusion of the state post conviction and related proceedings." The district court signed the stipulation, and the order was filed on February 9, 1994.

Libberton returned, once again, to state court, filing a fourth PCR Petition on September 12, 1994. He once again sought discovery, which was denied. Libberton claimed in his PCR Petition that the prosecution had unconstitutionally failed to inform him of Norton's "secret" plea agreement described in the Wertsching affidavit. The state submitted an affidavit by Parker, who denied that there had been such a deal. She stated, "I never made any promise of any kind to Norton's attorney that Norton would not be transferred for prosecution as an adult if he cooperated by testifying against Libberton and James." Warren Smoot, the Chief of the Juvenile Division at the time of Libberton's prosecution, and William Molner, an assistant to Smoot, submitted similar affidavits.

The state court concluded that it was unnecessary to decide whether there had, in fact, been a secret deal because, in its view, Libberton's claims would fail in any event. The court reasoned that Norton's earlier statements to police, which predated Norton's alleged deal with the prosecutor and his interview with Parker, were already incriminating. Because those earlier statements would have been available to bolster or

rehabilitate Norton's trial testimony, the state court concluded that the jury would likely have returned the same verdict even if such a deal had been made.

The state court also had before it an affidavit signed by Norton in October 1991, almost ten years after Libberton's trial. This affidavit had not previously been presented to either state or federal court. In the affidavit, Norton offered descriptions of Libberton's role in the murder, and descriptions of the murder itself, that contradicted his statements to police and to Parker, as well as his trial testimony.

In the affidavit, Norton described James as the clear leader of the assault and the subsequent murder. James "beat Maya up pretty bad and told Libberton and me to hit Maya too. We did as he ordered." Norton further stated that it had been James who ordered Maya to sign the title of his car over to Libberton. In his interview with Parker and in his trial testimony, Norton had said that it had been Libberton rather than James who had forced Maya to sign over the title. Norton also stated that both he and Libberton had "said that beating [Maya] up was enough and we should let him go. James said Maya would call the cops or come back to kill us. He insisted that Maya had to be killed." Norton went on, "Libberton and I both tried to talk James out of killing Maya. I specifically remember Libberton saying that he did not want to kill Maya and that Maya had done nothing to him." Norton explained that both he and Libberton went along with James because they were "scared" and "knew that James could kill us if we stood in his way."

Norton stated in the affidavit that on the way to the mine, Libberton had never actually pointed the gun at Maya and had never threatened him. At trial, however, Norton had testified that Libberton had pointed the gun at Maya and threatened to kill him. Norton further stated in the affidavit that James had ordered him and Libberton to participate since "he wanted [them] to be involved as he was." Norton concluded that

"James was the leader in everything that happened on that night," and that "[d]uring that night, Libberton tried many times to talk James out of killing Maya. To the extent Libberton participated, it was because James told him to. Acting alone, Libberton would not have killed Maya. Libberton did not want Maya to be killed."

The state court refused to consider Norton's affidavit because it "raises grounds that have been precluded" by Libberton's previous petitions. According to the court, the information in the affidavit could have been "discovered through the exercise of due diligence before the prior three petitions for Post-Conviction Relief were filed. . . . The affidavit now presented could have been prepared in 1982, or at any time thereafter."

The state court denied Libberton's fourth and final PCR Petition on November 21, 1996. Libberton petitioned the Arizona Supreme Court for review on May 12, 1997. Libberton's petition was denied on June 24, 1997.

## F. Current Federal Habeas Proceeding

Libberton filed a habeas petition in federal court on September 9, 1997, and an amended petition on February 17, 1998. The amended petition asserted forty-seven claims for relief. The district court denied the petition in its entirety on September 18, 2007.

Five questions are before us on appeal. First, is Libberton's federal habeas petition governed by AEDPA? Second, did the State violate *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), by failing to reveal an alleged deal between Norton and prosecutors? Third, did the State violate *Napue v. Illinois*, 360 U.S. 264 (1959), by failing to correct Norton's allegedly false testimony that there had been no such deal? Fourth, did the State violate *Tennard v. Dretke*, 542 U.S. 274 (2004), by requiring

a causal nexus between mitigating evidence and the crime of conviction? Fifth, did Libberton's trial counsel provide unconstitutionally ineffective assistance with respect to the penalty phase, in violation of *Strickland v. Washington*, 466 U.S. 668 (1984)?

## II.     Standard of Review

We have jurisdiction pursuant to 28 U.S.C. § 2253. We review de novo a district court's denial of habeas corpus. *Lopez v. Schriro*, 491 F.3d 1029, 1036 (9th Cir. 2007). We review for clear error a district court's findings of fact. *Richter v. Hickman*, ___ F.3d ___, 2009 WL 2425390, at *5 (9th Cir. Aug. 10, 2009).

**[1]** AEDPA provides that a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has explained that "[t]he threshold question under AEDPA is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000).

"Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Id.* at 365. A state court decision is "contrary to" Supreme Court law if "the state court applies a

rule that contradicts the governing law set forth in [Supreme Court] cases." *Id.* at 405. "A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 406. An unreasonable application of Supreme Court precedent occurs when a "state-court decision . . . correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08.

This standard under AEDPA is somewhat different when the state court does not provide a reasoned decision. When a state decision is unreasoned, we must "independently review the record to determine whether the state court clearly erred in its application of Supreme Court law. That is, although we independently review the record, we still defer to the state court's ultimate decision." *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002) (internal citation omitted).

## III.   Discussion

### A.   Applicability of AEDPA

**[2]** Libberton argues that AEDPA does not apply to his federal habeas petition. He concedes that his most recent federal petition was filed after the effective date of AEDPA, but he contends that it relates back to the filing date of his earlier pre-AEDPA petition, and is therefore governed by pre-AEDPA law. The district court rejected this argument and analyzed the petition under AEDPA. For the reasons explained below, we agree with the district court.

In effect, Libberton argues that the district court never really dismissed his earlier pre-AEDPA habeas petition, and that his post-AEDPA petition was merely an amendment to the earlier petition. First, he points us to the wording of the district court's dismissal of his pre-AEDPA petition. That

order, while termed a "dismissal," also provided that "Petitioner shall, if necessary, file an *amended* federal petition for writ of habeas corpus within 30 days of the conclusion of the state post conviction and related proceedings." (Emphasis added.) Libberton places great weight on the word "amended," contending that the district court must have retained jurisdiction over his pre-AEDPA petition in order for him to be able to amend it.

Second, Libberton contends that his case is analogous to *Rhines v. Weber*, 544 U.S. 269 (2005). In *Rhines*, the Supreme Court approved the procedure of staying and abeying a habeas petition, whereby a district court retains jurisdiction over a habeas petition while state law claims are being exhausted. Because Libberton's habeas petition was dismissed to enable him to exhaust his Wertsching-related claims in state court, Libberton argues that his case was functionally stayed and abeyed, despite the order's use of the term "dismissed."

**[3]** Neither the language of the district court's dismissal of Libberton's earlier petition nor *Rhines* is sufficient to maintain Libberton's argument. First, there is more to the language of the order than Libberton suggests. The district court's dismissal order explicitly "incorporate[d] to the extent applicable the order issued by the Honorable Roger G. Strand" in Steven James's habeas proceeding, in which the Wertsching affidavit had first been presented. Unlike Libberton, James had specifically requested that Judge Strand stay and abey his case. Judge Strand declined to do so. He discussed the typical justifications for stay and abeyance rather than dismissal and concluded that none of those justifications applied to James's case. The incorporation of Judge Strand's order, which explicitly refused to stay and abey James's habeas petition, into the dismissal of Libberton's petition is incompatible with a conclusion that Libberton's case was stayed and abeyed.

**[4]** Second, *Rhines* does not help Libberton. *Rhines* did approve the use of the stay-and-abeyance procedure in certain

circumstances, but it cannot be read to convert the district judge's dismissal in this case into a stay and abeyance. In *Rhines*, the petitioner requested a stay, and the Supreme Court noted that, had the district court denied the request, it may have been error. 544 U.S. at 278. Libberton, however, never requested a stay, and thus the district judge never denied one. On the contrary, Libberton and the state submitted a stipulation and a proposed order, and the district judge adopted it. While the order did refer to any later petition as "amended," the order was clearly titled a dismissal.

**[5]** We therefore conclude that AEDPA applies to Libberton's petition.

## B. *Giglio* Claim

As he did in the district court, and in state court before that, Libberton argues that the prosecution's failure to disclose its alleged secret deal with Norton constitutes a violation of due process under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). Neither the state court nor the district court made a finding as to whether such a deal in fact existed, but each court concluded that even if it did, the oral agreement was not material evidence, and therefore no *Giglio* error occurred. We agree with these courts that the agreement, if it existed, was not material within the meaning of *Giglio*. The state court's reasoned opinion rejected this claim, and the opinion is neither objectively unreasonable nor clearly contrary to binding Supreme Court law.

**[6]** In *Giglio*, a defendant learned during the course of his appeal that "the Government had failed to disclose an alleged promise made to its key witness that he would not be prosecuted if he testified for the Government." *Id.* at 150-51. The Court noted that "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule." *Id.* at 154 (quotation marks omitted). The Court went

on to conclude that the nondisclosure was material under *Brady*:

> Here the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.

*Id.* at 154-55. The Court therefore reversed the judgment and remanded for a new trial.

**[7]** The pivotal question under *Brady* and *Giglio* is whether the evidence withheld from the jury is material. The Supreme Court has explained this materiality standard as follows:

> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Libberton argues that *Giglio* requires that he be granted a new trial or at least a resentencing. He contends that in his case, as in *Giglio*, the prosecution never disclosed its oral deal with Norton, and that Libberton was only made aware of the deal ten years after it was made. Libberton contends that the prosecution's statements at trial illustrate the materiality of the alleged oral deal. *Cf. Kyles*, 514 U.S. at 444 ("The likely damage [of suppressed impeachment evidence] is best understood by taking the word of the prosecutor . . . ."). In her clos-

ing argument at trial, lead prosecutor Parker emphasized that at the time of her interview with Norton, he had "received no promises." She did so because the jury was aware that Norton had signed a plea agreement in which the prosecution agreed to prosecute Norton as a juvenile in exchange for his testimony. Parker sought to avoid an inference that Norton's testimony was biased because of this agreement by pointing to the statements Norton had given before signing the deal, including his interview with her. Libberton argues that the undisclosed deal gave Norton a motivation to lie in his interview with Parker, and that if the jury had been aware of the deal it would have been reasonably likely to reach a different verdict.

**[8]** We disagree. Unlike in *Giglio*, the key witness in this case, Norton, had already given a deeply incriminating statement to Detective Hackworth before the alleged deal was entered into. Therefore, the government could have pointed to a statement untainted by any secret deal, if such a deal existed, in order to corroborate Norton's trial testimony. Unlike in *Giglio*, where the jury was unaware of *any* deal with prosecutors, the jury in Libberton's case was well aware that Norton had reached a plea agreement with prosecutors whereby he agreed to testify in exchange for being prosecuted as a minor. The question is not whether Norton made a deal with prosecutors, but only when he did so. Given the availability of Norton's earlier statement to Hackworth as corroboration of his trial testimony, it is unlikely that the jury would have reached a different conclusion as to Libberton's guilt even if it had known of the alleged oral agreement.

## C.  *Napue* Claim

Libberton makes a related claim under *Napue v. Illinois*, 360 U.S. 264 (1959). In *Napue*, the prosecuting attorney asked the key witness whether "he had received [a] promise of consideration in return for his testimony." *Id.* at 265. The witness responded that he had not. However, "[t]he Assistant

State's Attorney had in fact promised him consideration, but did nothing to correct the witness' false testimony." *Id.* The Court noted that "it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment," and that "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* at 269.

**[9]** Libberton argues that a *Napue* violation occurred when Parker failed to correct Norton's testimony that he had not received a deal before she interviewed him. A *Napue* violation, however, also requires that the false evidence be material. *See, e.g.*, *Jackson v. Brown*, 513 F.3d 1057, 1075-76 (9th Cir. 2008) ("A jury's finding should be overturned as a result of . . . [a] *Napue* violation[ ] if and only if [it is] material."). While the precise materiality standard under *Napue* is slightly different than under *Giglio*, the result in this case is the same. Instead of asking whether there was a "reasonable probability" of a different outcome, a *Napue* violation requires a court to ask whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005) (en banc). For the reasons explained above, we conclude under AEDPA that Libberton's *Napue* argument does not succeed.

### D.  *Tennard* Claim

Libberton argues that the state trial court failed to consider all relevant mitigating evidence. He contends that *Tennard v. Dretke*, 542 U.S. 274 (2004), which was handed down while his case was pending before the district court, provides him relief. This argument was never presented to any state court and is therefore not exhausted. *See Picard v. Connor*, 404 U.S. 270, 275 (1971). "A federal court may not grant habeas relief to a state prisoner unless the prisoner has first exhausted his state court remedies" by "fully and fairly presenting each

claim to the highest state court." *Scott v. Schriro*, 567 F.3d 573, 582 (9th Cir. 2009). *See also* 28 U.S.C. § 2254(b)(1)(A).

### E. Ineffective Assistance of Counsel with Respect to Penalty Phase

Libberton claims that his counsel provided unconstitutionally ineffective assistance with respect to the penalty phase.

#### 1. Expansion of the Record

Libberton's argument in support of his IAC claim relies in part on evidence that was not presented to the state courts. The district judge in Libberton's federal habeas proceeding concluded that Libberton had not been diligent in pursuit of some evidence, and he therefore declined to admit it. For the reasons that follow, we conclude that Libberton diligently pursued the disputed evidence, and we therefore consider the evidence he sought unsuccessfully to present to the district court.

**[10]** "Rule 7 of the Rules Governing § 2254 cases allows the district court to expand the record without holding an evidentiary hearing." *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005) (citing 28 U.S.C. foll. § 2254, R. 7). However, before the record may be supplemented with new evidence, a petitioner must meet the same standard that is required for an evidentiary hearing. *Id.* In order to be awarded an evidentiary hearing, a petitioner must either: (1) satisfy the requirements of 28 U.S.C. § 2254(e), or (2) show that he "exercised diligence in his efforts to develop the factual basis of his claims in state court proceedings." *Id.* at 1241; *see also Holland v. Jackson*, 542 U.S. 649, 652-53 (2004). Libberton argues that he diligently pursued evidence in his state court proceedings, and that we should therefore expand the record to include his new evidence.

**[11]** While "diligence" has not been precisely defined in this context, the Supreme Court has advised that "[d]iligence

will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Williams v. Taylor (Williams II)*, 529 U.S. 420, 437 (2000). *Williams II* specifies that the proper question when considering a petitioner's diligence "is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts." *Id.* at 435. In this case, Libberton repeatedly asked the state court to grant an evidentiary hearing in which he could develop the facts relating to his IAC claim. He also repeatedly asked the state court to provide funds to aid him in his investigation. These requests were consistently rejected by the state court. Despite his indigence and the state court's refusal to provide an evidentiary hearing, Libberton was nonetheless able to acquire some affidavits relevant to an assessment of his counsel's conduct at sentencing. He presented these affidavits to state court. That court refused to give him an opportunity to develop more evidence and rejected his claims on the merits.

**[12]** Despite Libberton's diligence in state court, the district court concluded that Libberton was not diligent with respect to some evidence that he failed to present to the state court. While the district court is correct that this new evidence could possibly have been discovered while Libberton was litigating in state court, the question is simply "whether the prisoner was diligent in his efforts." *Williams II*, 529 U.S. at 435. Given the wealth of evidence that Libberton was able to present to the state court despite the state court's refusal to provide funds to aid in his investigation, and despite the lack of an evidentiary hearing in state court, Libberton was remarkably successful in finding and presenting evidence to state court. He did not discover all of the relevant evidence, as is apparent from the new affidavits he sought to present to the district court. But it is clear that he was diligent in pursuing it. *Cf. Correll v. Stewart*, 137 F.3d 1404, 1413 (9th Cir. 1998) ("Simply put, the state cannot successfully oppose a petitioner's request for a state court evidentiary hearing, then argue in federal habeas proceedings that the petitioner should be

faulted for not succeeding."). We therefore expand the record to include a deposition of his trial counsel, George Lim, as well as affidavits of Martin Norton and Dan McIntosh.

## 2. Ineffective Assistance with Respect to Sentencing

Libberton argued to the district court that his counsel at trial and sentencing, George Lim, was unconstitutionally ineffective. He appeals the denial of his ineffectiveness claim only as to sentencing. Partly in reliance on the evidence not presented to the state court and excluded by the district court, we conclude that Libberton's representation with respect to sentencing was unconstitutionally ineffective.

### a. Preliminary Observations

**[13]** Before reaching the merits of Libberton's IAC claim, we note two things. First, the state court's order denying his IAC claims was unreasoned. That order provided no citations to state or federal law and simply noted that "defendant received nothing but effective assistance of three very experienced and qualified criminal attorneys." Libberton had only one attorney at trial and at sentencing; we assume that the court was also referring to his appellate counsel. The state court concluded, without addressing any of Libberton's arguments or evidence, that "nothing defendant has raised in his current petition for post-conviction relief would have affected the outcome of the trial or the sentencing." Given this lack of reasoning, we "independently review the record to determine whether the state court clearly erred in its application of Supreme Court law." *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *see also Musladin v. Lamarque*, 555 F.3d 830, 835 (9th Cir. 2009). We also note that the state court did not have before it some of the evidence that is now before us. This new evidence, which Libberton diligently pursued but did not discover while in state court, adds substantially to Libberton's ineffectiveness arguments.

Second, a common shorthand for an IAC claim is "ineffective assistance during the penalty phase." If taken literally, this shorthand is misleading. The question is whether a defendant's counsel was ineffective with respect to the penalty imposed, irrespective of when during the proceedings the counsel was ineffective. It is often the case that a counsel's ineffectiveness is manifested during the penalty phase, as the common shorthand suggests. For example, defense counsel may have failed to discover a witness who would have testified favorably during the penalty phase. But ineffectiveness is often manifested earlier. For example, defense counsel may have failed to discover impeaching evidence that could have been used against an unfavorable witness who testified during the guilt phase, and which would have portrayed the defendant in a light that would have assisted him at the penalty phase. As we wrote in *Daniels v. Woodford*, 428 F.3d 1181, 1210 (9th Cir. 2005), "The combination of counsel's guilt and penalty phase deficiencies . . . den[ied] Daniels effective representation and prejudiced the outcome of his penalty phase trial." *See also Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999) ("[C]ounsel's deficient performance, including counsel's performance during the guilt phase of Moore's trial, prejudiced the outcome of the punishment phase of Moore's trial."); *Slagle v. Bagley*, 475 F.3d 501, 528 (6th Cir. 2006); *Cargle v. Mullin*, 317 F.3d 1196, 1208-09 (10th Cir. 2003).

#### b.    Merits of Penalty Phase IAC Claim

**[14]** *Strickland v. Washington*, 466 U.S. 668 (1984), provides that, in order to establish ineffective assistance of counsel, one must show both deficient performance and prejudicial effect. To establish deficient performance, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. To establish prejudice he must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Three recent Supreme Court opinions address an attorney's obligation to conduct an investigation in preparation for a sentencing hearing in a capital case. All three cases were decided under the standards established in AEDPA.

First, in *Williams v. Taylor*, 529 U.S. 362, 395 (2000), an attorney's "representation during the sentencing phase fell short of professional standards." The Supreme Court explained that defendant's counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." *Id.* Had this investigation occurred:

> the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

*Id.* The Court noted that "[o]f course, not all of the additional evidence was favorable to Williams." *Id.* at 396.

The Court disagreed with the state court's analysis of prejudice, noting that it "was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in reweighing it against the evidence in aggravation." *Id.* at 397-98. The Court held that if all the mitigation evidence had been presented to the jury, it "might well have influenced the jury's appraisal of his moral culpability," and that "[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not

undermine or rebut the prosecution's death-eligibility case." *Id.* at 398.

**[15]** Second, in *Wiggins v. Smith*, 539 U.S. 510, 521 (2003), defendant's IAC claim "stem[med] from counsel's decision to limit the scope of their investigation into potential mitigating evidence." The state argued that the limited investigation "reflect[ed] a tactical judgment not to present mitigating evidence at sentencing and to pursue an alternative strategy instead." *Id.* The Court rejected this argument. The Court noted that Wiggins's counsel investigated three sources of mitigating evidence: a psychologist's report, the presentence report, and social service records. *Id.* at 523. Despite the fact that funds were available, Wiggins's counsel did not order a report from a forensic social worker. *Id.* at 524. The Court further noted that ABA Guidelines require that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Id.* (quotation marks omitted). The Court concluded that "[t]he record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Id.* at 526. Given the fact that counsel did not investigate beyond the evidence described above, the Court concluded that they "chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Id.* at 527-28.

The Court concluded that the "mitigating evidence counsel failed to discover and present in this case is powerful," and that the failure to discover it was prejudicial. *Id.* at 534. Wiggins had been abused as a young child, including "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." *Id.* at 535. Wiggins was also homeless for a time, and had "diminished mental capacities." *Id.* "Given both the nature and the extent of the abuse peti-

tioner suffered, we find there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form." *Id.* "Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Id.* at 537.

Third, in *Rompilla v. Beard*, 545 U.S. 374, 381 (2005), the Court described the defense attorney's pre-sentence investigation, noting that "[t]his is not a case in which defense counsel simply ignored their obligation to find mitigating evidence." Defense counsel interviewed some members of Rompilla's family and examined the reports of three mental health experts. In all, Rompilla's lawyers spoke with five members of Rompilla's family in a "detailed manner" in an attempt to unearth mitigating information. *Id.* Those family members, however, "didn't really feel as though they knew him all that well." *Id.* at 382. During Rompilla's post-conviction process, new counsel pursued evidence that his trial counsel had never investigated, including school records, records of Rompilla's juvenile and adult incarcerations, and evidence of Rompilla's history of alcohol abuse. *Id.* Most important, Rompilla's post-conviction attorneys investigated the court file on Rompilla's prior conviction, which his trial counsel had not done. *Id.* at 383.

The Court concluded that the unexamined court file led to mitigating evidence of sufficient persuasive power that counsel's ineffective assistance had prejudiced Rompilla. The file revealed that both Rompilla's parents were severe alcoholics who drank constantly, and that Rompilla's father "frequently beat Rompilla's mother." *Id.* at 391-92. Rompilla's father abused him physically and verbally. *Id.* at 392. Medical experts discovered that Rompilla had organic brain damage and had likely suffered from fetal alcohol syndrome. *Id.* The Court concluded that "[t]his evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy

actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test." *Id.* at 393. Since the mitigating evidence, taken as a whole, "might well have influenced the jury's appraisal of [Rompilla's] culpability," the Court remanded either for resentencing or for stipulation to a life sentence. *Id.* (quotation omitted and alteration in original).

### i.    *Strickland*'s Deficient Performance Prong

**[16]** Under the Court's analysis in *Williams*, *Wiggins*, and *Rompilla*, Lim's performance at Libberton's sentencing hearing was deficient. Lim called only two mitigating witnesses, both of whom were only tenuously connected to Libberton. One had not seen Libberton in ten years. The other was the mother of an ex-girlfriend. Lim did not interview Libberton's sister, who could have been easily located. And while Lim did talk with Libberton's mother, he did not ask her to testify. As a consequence, the only information from Libberton's family that made its way to the judge was contained in the PSR. The PSR contained Libberton's father's damning conclusion that "his son is a liar and a thief." The PSR paraphrased Libberton's father as stating that he "does not doubt that the defendant actually committed this crime and, in fact, believes [Libberton] may have been the leader in planning the crime." Lim made no attempt to impeach the father's comments.

**[17]** Lim also did not pursue evidence of James's primary responsibility for the crime. He said at the sentencing hearing that Libberton had not been the driving force behind the murder, but he did not present any testimony or evidence to that effect. He could have interviewed a number of witnesses, all of whom would have confirmed James's violent nature and mental state on the day of the crime. Lim also did not investigate Norton's background; as seen above, Norton described Libberton at trial as an equal participant with James in Maya's murder. If Lim had conducted an adequate investigation of

Norton's background, he would have discovered powerful psychological evidence showing Norton to be an unreliable witness.

**[18]** The Supreme Court has found deficient performance even where a lawyer did far more than Lim did in this case. The Court in *Rompilla* wrote, "This is not a case in which defense counsel simply ignored their obligation to find mitigating evidence, and their workload as busy public defenders did not keep them from making a number of efforts, including interviews with Rompilla and some members of his family, and examinations of reports by three mental health experts who gave opinions at the guilt phase." 545 U.S. at 381. The Court went on to specify that the lawyers "spoke with five members of Rompilla's family (his former wife, two brothers, a sister-in-law, and his son)." *Id.*

**[19]** Lim's deposition, in conjunction with the minimal presentation of mitigating evidence at Libberton's sentencing, conclusively establishes that Lim's performance was worse than that of the attorneys in *Rompilla*. During the four months between conviction and the sentencing hearing, Lim spent very little time preparing for sentencing. In his deposition, Lim did not recall interviewing any witnesses for trial, and only a very few witnesses for sentencing. The two witnesses he did present at sentencing had only tangential knowledge of Libberton's family history, and had no knowledge whatsoever about the details of the crime and Libberton's role in it. Lim obtained funds to hire an investigator, but the investigator never interviewed anyone. Lim acknowledged in his deposition that "[p]erhaps it might have helped to interview a couple of the witnesses." He further admitted in his deposition that he never interviewed Norton, and that he never tried "to talk to anybody to find out background information about Norton, whether he was a truthful person." No possible strategy could justify this lack of diligence in pursuing mitigating evidence. Under *Williams*, *Wiggins*, and *Rompilla*, Lim's conduct fails the first prong of *Strickland*.

ii.   *Strickland*'s Prejudice Prong

**[20]** The state PCR court and the federal district court con-
cluded that Libberton had failed to establish prejudice. We
disagree. The Supreme Court has explained that the prejudice
inquiry requires us to "reweigh the evidence in aggravation
against the totality of available mitigating evidence." *Wiggins*,
539 U.S. at 534. We therefore begin by recounting the evi-
dence that was presented to the jury. We then describe the
evidence Lim failed to discover and present, and analyze how
that evidence would have materially changed the sentencing
calculus.

a.   The evidence at sentencing

The prosecution and Libberton each called two witnesses to
testify at the sentencing hearing. The state's witnesses, Carl
Hass and Bill Fitzgerald, both testified that Libberton had
walked away from a work furlough program in the days
before Maya's murder.

Lim called Nancy Henry and Geraldine Smith. Henry was
a friend of Libberton's mother, but she explained that until the
time of the crime she had not seen Libberton in ten years. She
testified that Libberton had a "love-hate relationship with his
father," and that "he tries to please his father but can't." She
testified that Libberton's father "disappointed him a lot," and
"at times ran him down." She further explained that she had
visited Libberton in jail, and he admitted to having used
drugs. Finally, she testified that she did not consider Libber-
ton a violent person, and that "he is more of a follower."

Smith testified that she was the mother of one of Libber-
ton's ex-girlfriends. She had known Libberton for a few
years, and he had lived in her home for approximately a
month. Like Henry, Smith testified that Libberton had "diffi-
culties with his father," and that he "would try and go for-
ward, [but] his dad would knock him down, and now he is

here today because of his dad." She explained that Libberton's father had refused to pay Libberton for work done at the father's business, and that Libberton "broke into his dad's place, because his dad owed him money and his dad wouldn't pay him." She also reported that Libberton had used drugs regularly, and that he was not a violent person. On cross-examination, Smith admitted that she had not talked with Libberton in a long time, "not since my daughter and him broke up." Smith also explained that Libberton had suffered an injury as a child falling out of a vehicle, that he had once been hit by his stepmother over the head, and that he had once been hit over the head with a bat. As a consequence, "[h]e had terrible, terrible headaches" and tried to go see a doctor. However, his father would not help him pay, so he never went.

In Lim's closing, he emphasized that Libberton had a troubled relationship with his father, and that there was no record of Libberton having previously committed any violent crimes. Lim also pointed to Libberton's psychological issues, and said that he had previously tried to get psychological help. Lim stated that "Libberton appeared to be a follower rather than the instigator and that Mr. James apparently wanted the person killed," and that Libberton was really "like a blind sheep."

The sentencing court also had before it a presentence report ("PSR"), and reports from Drs. Paul Bindelglas and George Dee. Libberton's father told the PSR investigator that while the crime was "uncharacteristic of his son's behavior," he "does not doubt that the defendant actually committed this crime and, in fact, believes he may have been the leader in planning the crime." While the PSR's social history explained that Libberton had moved frequently as a child, it reports no childhood abuse. The PSR stated that Libberton had been treated by a psychiatrist for "emotional problems he experienced as an adolescent," and that he had never received psychological treatment that he alleged was promised to him by a state court.

Dr. Bindelglas described Libberton as "a young man from a broken home who seems to have some effeminate mannerisms but no overt homosexual activities." It was Bingelglas's opinion that "[a]lthough Mr. Libberton is sane legally, I do feel he has severe psychological problems." Moreover, Bindelglas stated that "I do not believe Mr. Libberton acted with premeditation. He is much too impulsive for that." Dr. Dee reported that Libberton suffered from chronic depression, and had "severe emotional problems." He further concluded that "[w]ithout intensive treatment he would be like a time bomb waiting to go off."

### b.   Evidence that Lim Could Have Discovered

[21] Evidence that Lim could have discovered in the course of a proper investigation would have dramatically transformed the case for mitigation. In our view, the evidence that Lim failed to discover is sufficiently persuasive that, had it been presented to the sentencing judge, there is a reasonable probability that he would have imposed a different sentence.

[22] First, Libberton presents evidence showing that the crime was the result of James's instigation and that Libberton was merely a follower. Lim had stated in his closing argument at sentencing that Libberton was merely a follower in murdering Maya, but the only evidence supporting that statement was Henry's rather vague statement that Libberton was "more of a follower." That vague statement was directly contradicted by Libberton's own father's statement in the PSR that he believed his son "may have been a leader in planning the crime."

Daniel Severance explained in an affidavit presented to the federal habeas court that he had been with James on November 16, the day Maya was killed. He explained that "James was . . . very emotionally upset on that date because his girlfriend had recently left him. He had even cried about her departure, which was very unusual for Mr. James." James was

also "extremely violent as a result of drinking due to the situation involving his girlfriend." Severance recalled that, in the days immediately preceding Maya's murder, he and James cleaned James's gun after his girlfriend finally departed, and even practiced firing it outside the trailer. Severance further explained that "James also became very upset involving any situation with Martin Norton, who Mr. James looked at as a son." He believed that "Mr. James was in a very bizarre emotional state as a result of his girlfriend's departure," and that he "had no doubt . . . that Mr. James intended to do exactly what he said he would do . . . , which was kill the individual with Mr. Norton." While Severance did not know Libberton well, he believed Libberton "was simply at the wrong place at the wrong time while Mr. James did exactly what he indicated he was going to do which was to kill." Finally, Severance averred that he was never contacted by Lim, but could have been easily located in Phoenix.

This same portrait of James emerges from an affidavit submitted by his former girlfriend, Diana Hodge. She stated that after moving out of James's trailer she "feared for [her] life because of the things that Mr. James said and did." When she moved out of the trailer, she "solicited the help of two large black males to help [her] move." She explained that towards "the end of the move from the trailer, Mr. James arrived in a very intoxicated state and he was also very high on drugs. He was extremely upset and made the comment 'When I find you, I'll kill you.' He made the same threat later by telephone." Hodge further stated that she was

> convinced that Mr. James would have killed me or anyone else for revenge because he was so upset that I left. In my opinion, he was in a horrible state of mind after I left him and he had the ability to kill someone because of his deranged mind. I think Stephen James had the capacity to kill.

She stated that Lim "never made any attempt to contact me during the first one or two years after the incident. I was liv-

ing in the Phoenix area and certainly could have been located had they made an attempt to do so."

Dan McIntosh could have further corroborated James's role as the leader and Libberton's role as a follower. McIntosh explained in an affidavit that "James borrowed [the] gun from a man who lived nearby" because "[h]e was upset because his girlfriend had moved out to live with two black men." He also recalled that James once showed him "Polaroid photographs of gallows he had built," and that "he had hung his dog from the gallows." After being arrested James "telephoned [McIntosh] and threatened to kill [him] and [his] family if [he] testified against" James. Despite the fact that McIntosh testified in the guilt phase of trial, he was never contacted by Lim with regard to sentencing.

Libberton also seeks to rely on Norton's post-trial affidavit to support his argument that he was merely a follower. It is important to Libberton that he present evidence Lim could have used to impeach Norton, for the portrayal of Libberton as a coequal in Maya's murder was entirely the result of Norton's testimony. Norton was the only eyewitness other than James and Libberton. Norton testified that Libberton was not merely a follower, but an eager participant in the crime. As noted above, Norton signed this affidavit about ten years after the trial. It is unlikely that Lim, even if he had been diligent, could have obtained such an affidavit, or such testimony, at the time of sentencing. At the time of Libberton's sentencing phase trial, Norton had just been convicted and sentenced himself, and the contents of his affidavit directly contradict much of his testimony at trial. His plea bargain depended on his having provided truthful testimony at trial. We therefore do not rely on Norton's affidavit.

**[23]** However, other evidence was readily available that Lim could have used to impeach Norton. Norton's juvenile record included evidence that could have seriously impeached his testimony. His intake summary at the Maricopa County

Juvenile Court Center noted that "[a]t times he will lapse into saying most anything that comes to his mind, or tell stories, in answer to a question, that are obviously not true. Also, he seems to feel very much threatened when the subject of homosexuality is brought up." Norton's psychological evaluation noted that he "has a very difficult time perceiving any situation in a matter-of-fact way. He has a very overpersonalized and at times distorted perception of the environment which makes it difficult for him to maintain any stability." The evaluation goes on to find "significant and marked identity and psychosexual confusion and once again, Martin attempts to deal with this through overcompensation and projection." Had this evidence been presented at trial and at the sentencing hearing, it would have seriously undermined Norton's portrayal of Libberton as a coequal participant with James in Maya's murder.

**[24]** Second, Libberton presents evidence showing that he was seriously abused during his childhood. The Supreme Court has repeatedly held that evidence of childhood abuse is a relevant mitigating factor. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 535 (2003) ("Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability."); *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." (quotation marks omitted)). Libberton's mother and sister were available to testify, and could have painted a sympathetic portrait of Libberton. Lim had spoken to Libberton's mother, but he did not call her to testify at the sentencing hearing. In her affidavit, she described Libberton's father as abusive. She explained that Libberton's father "had a very hot temper and when he would get angry, he would fly into a rage." She recalled that after she and her husband divorced

she "received a telephone call from Child Protective Services . . . informing me that Steven and Larry had been dropped off there by their father. Dave had severely beaten the boys and taken them to the juvenile center stating that he [no] longer wanted them."

Libberton's sister, Susan Farias, corroborated and gave further details of Libberton's abuse by his father. She explained in her affidavit that their father "was physically abused as a child and in turn abused us." She explained that while "Larry" was apparently her father's favorite child when he was young, as he grew older "he was beaten more" than the other children. Their father "would take his belt, fold it in half and snap it a few times before he hit" his children. After Libberton's parents divorced, Libberton's step-father also abused him.

Libberton's abusive childhood was further described by Helen Robichaux, a childhood friend of Libberton's. She recalled in an affidavit that Libberton's father "had a very violent temper and was a difficult man to get along with." She also "remember[ed] Larry coming to school after he had been punished. Sometimes he would still be bruised from the punishment."

[25] However, the only family member whose opinion was put before the sentencing court was Libberton's father. The same father who abused Libberton as a child was quoted in the PSR as saying not only that his son could have participated in such a murder, but that he was likely to have been the leader in the conspiracy. Libberton's mother and sister could have seriously undercut his father's opinion, but Lim failed to put them on the stand.

[26] In sum, Lim failed to find and present extensive evidence that would have showed James's greater culpability in Maya's murder, would have showed Libberton's abusive childhood, and would have contradicted the very damaging evidence supplied by Libberton's father. We conclude that the

failure to find and present this evidence was prejudicial. Lim's failures create a reasonable probability that, had the above-described evidence been presented to the sentencing judge, he would have imposed a lesser sentence. *Strickland*, 466 U.S. at 694. Because Libberton has satisfied both *Strickland* prongs, we grant his petition with regard to sentencing.

## Conclusion

Libberton's arguments as to the guilt phase of his trial all fail. Even if it is true that Martin Norton entered into an undisclosed deal with prosecutors before being interviewed by the prosecutor, this would not be material. Libberton has failed to establish that, had the alleged oral deal been revealed to the judge, there would have been a reasonable probability of a different outcome. Because he cannot meet that standard of materiality, his arguments under *Brady*, *Giglio*, and *Napue* fail. We do not reach the merits of Libberton's *Tennard* argument, as it was not exhausted in state court.

However, we conclude that his counsel rendered unconstitutionally ineffective assistance with respect to sentencing.

**[27]** We therefore AFFIRM the judgment of the district court with respect to all of Libberton's guilt-phase claims. However, we REVERSE the judgment of the district court and remand with instructions to grant the writ of habeas corpus with respect to sentencing. We instruct the district court to grant the state a reasonable amount of time in which to resentence Libberton. If the state chooses not to resentence, Libberton's sentence will automatically be converted to life in prison in accordance with Arizona law.